32 So.2d 22

## NELSON v. LEE.

### 6 Div. 283.

Supreme Court of Alabama.

June 26, 1947.

Rehearing Denied Oct. 16, 1947.

Horace C. Wilkinson, of Birmingham, for appellant.

J. P. Mudd and E. M. Friend, Jr., both of Birmingham, for appellee.

LAWSON, Justice.

On the morning of January 23, 1943, the appellee, T. K. Lee, a Mr. Bales, and Charles A. Nelson left Birmingham in a car owned and driven by Mr. Bales, for the purpose of shooting hawks and crows. Lee and Nelson both carried high-powered rifles. They travelled as far south as Brent, Alabama, and returned to Birmingham late in the afternoon by way of the Montgomery highway. Throughout the trip Lee sat in the front seat on the driver's right. Nelson was sitting on the rear seat. Upon returning to Birmingham, Bales drove his car to Lee's residence, where Lee and Nelson were to get out. When they arrived at Lee's residence, his rifle was located between himself and the driver, Bales. The stock of the rifle was under the dashboard in the direction of the front of the car and the muzzle was pressed back against the upholstery of the back of the front seat pointing toward the rear of the car. As Lee was in the act of getting out of the automobile and removing his rifle, the rifle fired. The bullet went through the back of the front seat of the car and entered the body of Mr. Nelson, who died shortly thereafter as a result of the injury so received.

554

This suit was brought under our homicide statute, § 123, Title 7, Code of 1940, by Mrs. Maurine Nelson, as administratrix of the estate of her deceased husband, Charles A. Nelson, against T. K. Lee, to recover damages for negligently causing the death of the said Charles A. Nelson, deceased. There was verdict for defendant and judgment thereon. Plaintiff's motion for a new trial having been overruled, she has appealed to this court.

The case was submitted to the jury on only one count, namely, Count 5, which in pertinent part charged:

"* * * That heretofore on, to-wit; the 23rd day of January, 1943, the defendant and plaintiff's intestate, Charles A. Nelson, and another were returning from shooting hawks or crows or other members of the feathered tribe, in an automobile in which the defendant carried or transported a loaded, highpowered rifle, which the defendant pointed or caused the muzzle of said rifle to be pointed toward the plaintiff's intestate, and while said rifle was so pointed, same was discharged and plaintiff's intestate was killed.

"Plaintiff avers that the defendant was guilty of negligence in or about pointing or causing said rifle to be pointed toward plaintiff's intestate on said occasion, and as a proximate consequence, said rifle was discharged and plaintiff's intestate killed on said occasion."

Defendant's plea No. 1 was the general issue. Plea No. 2, a plea of contributory negligence, was as follows:

"That the plaintiff's intestate was himself guilty of negligence which proximately contributed to his death in this; that the plaintiff's intestate loaded said rifle and while the plaintiff's intestate and defendant were seated in said automobile, the plaintiff's intestate being in the rear seat, and the defendant on the front seat, the plaintiff's intestate negligently handed the loaded rifle to the defendant and requested that the defendant place said rifle in the front part of the car; that the defendant received said rifle from the plaintiff's intestate but did not know that said rifle was loaded at such time and plaintiff's intestate failed to apprise him of the fact, that the plaintiff's intestate knew that said rifle was loaded and knew where the defendant would place said rifle and negligently continued to ride and remain in said automobile for a number of miles, to-wit; 7 or 8 miles, while said loaded rifle was in the front of said car and with the barrel thereof pointed in the direction of the plaintiff's intestate; and in close proximity to him, all of which was known to him, that the plaintiff's intestate knew that it was dangerous to him to ride in said car or to remain there with the muzzle of said loaded rifle pointed towards him and in close proximity to him and the defendant avers that it was dangerous for the plaintiff's intestate to remain and continue to sit on the rear seat of said car with the muzzle of said loaded rifle pointed towards him and in close proximity to him; and with knowledge of such danger to himself and said circumstances, the plaintiff's intestate negligently continued to ride and remain in said position in said car, and the plaintiff's intestate's said negligence proximately contributed to his own death."

Plaintiff's demurrer to the plea of contributory negligence was overruled by the trial court and such action is the basis of the first assignment of error.

We think the demurrer to the plea of contributory negligence was properly overruled. Rule of Practice 37 of the circuit and inferior courts of common law jurisdiction, Code 1940, Tit. 7 Appendix, which became effective the first Monday in October, 1942 (242 Ala. XVI), provides as follows:

"In pleading contributory negligence no greater particularity of averment as respects the acts, omissions, conduct or behavior relied on as constituting contributory negligence is required than is required in averring, in a complaint, the acts, omissions, conduct or behavior relied on as constituting negligence. A plea of contributory negligence shall be interpreted as charging contributory negligence subsequent to discovery of peril to the same extent that an averment of negligence in a complaint, of the same tenor as the averment of contributory negligence in the plea, would be interpreted as charging negligence subsequent to discovery of peril."

But aside from the rule above set out, we think that the defendant's plea of contributory negligence shows a course of conduct on the part of the deceased which, if true, would prevent recovery by plaintiff under the averments of her bill of complaint. The said plea shows that the plaintiff's intestate negligently created a dangerous condition or situation which was known to him to be dangerous and which condition or situation continued to the time of the accident and was a current factor therein. Plaintiff insists that it was incumbent upon the defendant to examine the rifle after it was handed to him by the deceased to determine whether or not it was loaded and that his failure to do so was the proximate cause of the death of the plaintiff's husband and that the course of conduct of the deceased as set up in the plea of contributory negligence shows at most only a remote cause or a mere antecedent occasion or condition and, therefore, does not constitute contributory negligence. We cannot agree with such insistence. We are of the opinion that the effect of the plea of contributory negligence is, admitting defendant's negligence, that the decedent was negligent and that such negligence was a concurring factor existing at the very time of the accident. Under the averments of the plea of contributory negligence, the deceased by handing the rifle to defendant did not relieve himself of the duty of advising the other occupants of the automobile that the rifle was loaded nor did he thereby escape responsibility for exercising care for his own safety. In Heffelfinger v. Lane, 239 Ala. 659, 196 So. 720, 722, it is said:

"We have often recognized the principle that one does more than to create a condition when he knows that such condition is dangerous as respects certain other conduct liable to occur. When that situation is negligently or voluntarily created, and the dangerous event occurs such as was foreseeable, resulting in injury, the one creating such danger is a proximate contributor to it, though defendant may be such an one also."

Mr. C. B. Nelson, the father of the deceased, in testifying on behalf of the plaintiff stated that the defendant said shortly after the accident that the shooting of deceased was a careless act. On cross-examination Mr. Nelson testified that on the day after the accident, in the office of the coroner of Jefferson County, he had another conversation with the defendant, in which the following occurred: "I told Mr. Lee that none of the family believed for a minute that it was intentional or anything like that, and he put his arms around me and cried on my shoulder and told me that he appreciated what I had said, and that Charley was the best friend he ever had in his life, and all that."

Thereafter the defendant called Mr. Gyp M. Evans, the coroner of Jefferson County, who testified that he remembered seeing Mr. C. B. Nelson, the father of deceased, and the defendant engaged in a conversation in his office on the day after the accident, but that he did not remember anything that was said in that conversation. On cross-examination of this witness, the following transpired:

"Q. (By Mr. Wilkinson): Mr. Evans, you conducted an inquest in the matter and an investigation into the cause of the death of Charles Nelson, did you not? A. Yes, sir.

"Q. I hand you your file which you brought into court under subpoena duces tecum, F-1202, Re Charles Nelson, deceased. I will ask you if Mr. T. K. Lee was examined under oath—A. Yes, sir.

"Q. —During the investigation you made into the cause of death of Mr. Charles A. Nelson? A. Yes, sir.

"Q. Is that testimony I hand you the testimony he gave on that examination under oath? A. Yes, sir.

"Q. And that is a part of the records of your office? A. Yes, sir.

"Mr. Wilkinson: That is all.

"Mr. Taylor: If you don't offer it, we will.

"Mr. Mudd: We would like to offer it if you don't.

"Mr. Wilkinson: I have no objection to you offering it.

"Mr. Mudd: Then, as I understand, the testimony of Mr. Lee before Coroner Evans is in?

"Mr. Wilkinson: It is not in yet.

"Mr. Taylor: We offer it.

"Mr. Wilkinson: It is not your time to offer that yet."

On redirect examination by counsel for the defendant the following transpired:

"Q. (By Mr. Mudd): Is that the testimony you wrote up there that was given by Mr. Lee? A. You mean in this file?

"Q. Yes. A. Yes, sir.

"Mr. Mudd: Well, we offer that in evidence.

"Mr. Wilkinson: Well, we object to it at this time.

"The Court: Well, let me understand it. You say your file?

"The Witness: Testimony—statements Mr. Lee made to me in my office under oath is in this file.

"The Court: What I had in mind was under section 415 of Title 7, if it is shown to be in the due course of business,—that is not required by law to be kept, of course. You will have to lay the proper predicate.

"Mr. Wilkinson: The point is the defendant can testify. He can't offer his testimony on some other proceeding. He can offer—

"Mr. Mudd: We would like to ask if that is a record and document he keeps in the ordinary course and conduct of his office, and if it hasn't been kept there by him since it was taken.

"The Court: What is your answer, sir?

"The Witness: Yes, sir.

"Mr. Mudd: Then we offer it.

"The Court: All right, overruled.

"Mr. Wilkinson: We except.

"Mr. Mudd: All right, sir.

"Mr. Wilkinson: We move to exclude it on the ground that it is illegal, irrelevant, incompetent, and immaterial; self-serving declarations; on the ground the defendant is in court and can testify.

"The Court: I am admitting it under Section 415 of Title 7 of the Code.

"Mr. Wilkinson: All right, sir. We reserve an exception."

█ We call attention to the fact that the document so introduced was not a copy of the death certificate certified by the State Registrar of Vital Statistics. Such a certificate is admissible and is prima facie evidence of facts therein stated. § 42, Title 22, Code 1940; Jefferson Standard Life Ins. Co. v. Wigley, 248 Ala. 676, 29 So.2d 218, 219; Fleetwood v. Pacific Mutual Life Ins. Co., 246 Ala. 571, 21 So.2d 696, 159 A.L.R. 171; American Life Ins. Co. v. Williams, 234 Ala. 469, 175 So. 554, 112 A.L.R. 1215.

The said document was but the statement made by the defendant when examined by the coroner. It was his version of how the accident occurred and was no doubt made in accordance with the provisions of § 76, Title 15, Code 1940, which is in pertinent part as follows:

"When a coroner has been informed that a person has been killed, or suddenly died under such circumstances as to afford a reasonable ground for belief that such death has been occasioned by the act of another by unlawful means, he must forthwith make inquiry of the facts and circumstances of such death by taking the sworn statement in writing of the witnesses having personal knowledge thereof, and submit the same to a judge of a court of record or a solicitor; * * *."

█ The defendant was present in court but did not testify in his own behalf. By the introduction in evidence of the testimony which he gave before the coroner, he had the benefit of his story of the accident without subjecting himself to cross-examination. No case from this jurisdiction involving this exact situation has come to our attention, but the rule has long prevailed in this state, as it does in most states, that the mere fact that testimony has been given in a cause in a former proceeding between the parties to a case on trial is no ground for admitting it in evidence. Even in such cases where there was opportunity for cross-examination before such evidence can be admitted it must be shown that the witness or witnesses whose testimony is offered are not available for examination at the time of the trial. Burns v. Leath, Sheriff, 236 Ala. 615, 184 So. 176; E. E. Yarbrough Turpentine Co. v. Taylor, 201 Ala. 434, 78 So. 812. We think the above-stated rule applicable to the use as primary or original evidence

of testimony given when examined by the coroner, unless § 415, Title 7, Code 1940, operates to permit its introduction. The following cases from other jurisdictions so hold: Brogdon v. Northwestern Ry., 141 S.C. 238, 139 S.E. 459; Carroll v. Krause, 280 Ill.App. 52. As before pointed out, we are not here dealing with the use of such testimony for the purpose of impeachment. Here the said written statement is sought to be used as primary or original evidence, although the party who gave it was present in court, but did not testify in his own behalf.

We come, therefore, to a consideration of § 415, Title 7, Code 1940, which the trial court construed as authorizing the admission of the statement made by the defendant upon examination by the coroner. Said section is as follows:

"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible in evidence in proof of said act, transaction, or event, if it was made in the regular course of any business, and it was the regular course of the business to make such memorandum or record at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term, 'business' shall include business, profession, occupation, and calling of every kind."

This section is new to the Code of 1940 and has been considered heretofore by this court in only a few cases. In Wilson v. State, 243 Ala. 1, 8 So.2d 422, and Hall v. State, 248 Ala. 33, 26 So.2d 566, it was construed as authorizing the introduction into evidence of certain records kept by a board of health and by a hospital. In Mitchell v. City of Mobile, 244 Ala. 442, 13 So.2d 664, 668, after considering the several subsections of § 414, Title 7, Code 1940, which relate to the introduction in evidence of certain books of account and which have been part of our statutory law for a number of years, Mr. Justice Bouldin in writing for the court said: "Deeming these statutes [§ 414, Title 7] inadequate to the needs of present day business, an additional section was added in the Code of 1940, which reads: § 415. * * *"

We do not think that § 415, Title 7, supra, has application to the sworn statements made before a coroner in his investigation of a death. It was not intended to provide a means of substituting for oral testimony and the opportunity of cross-examination, self-serving declarations in the form of a narrative statement of an event.

A statute in all material respects identical in language to § 415, Title 7, supra, has been enacted by the federal government. For an historical treatment see 5 Wigmore, Evidence §§ 1520, 1530 (3d Ed. 1940).

An act of Congress of June 20, 1936, is practically in the identical language of our § 415, Title 7, supra. 49 Stat. 1561, 28 U.S. C.A. § 695. In the case of Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719, the Supreme Court of the United States had before it a question similar in many respects to the one here under consideration. That case arose out of a grade crossing accident which occurred in Massachusetts, but diversity of citizenship brought it to the federal district court in New York. The accident occurred on December 25, 1940. On December 27, 1940, the engineer of the train, who died before the trial, made a statement at a freight office of the railroad company where he was interviewed by an assistant superintendent of the road and by a representative of the Massachusetts Public Utilities Commission. This statement the railroad offered in evidence under the aforementioned Act of Congress of June 20, 1936. They offered to prove (in the language of the Congressional Act) that the statement was signed in the regular course of business, it being the regular course of such business to make such a statement. Objection to the introduction of the statement was sustained. The Supreme Court of the United States upheld that ruling in an opinion written for the Court by Mr. Justice Douglas, wherein it is said:

558

"We may assume that if the statement was made 'in the regular course' of business, it would satisfy the other provisions of the Act. But we do not think that it was made 'in the regular course' of business within the meaning of the Act. The business of the petitioners is the railroad business. That business like other enterprises entails the keeping of numerous books and records essential to its conduct or useful in its efficient operation. Though such books and records were considered reliable and trustworthy for major decisions in the industrial and business world, their use in litigation was greatly circumscribed or hedged about by the hearsay rule—restrictions which greatly increased the time and cost of making the proof where those who made the records were numerous. 5 Wigmore, Evidence (3d Ed. 1940) § 1530. It was that problem which started the movement towards adoption of legislation embodying the principles of the present Act. See Morgan et al., The Law of Evidence, Some Proposals for its Reform (1927) c. V. And the legislative history of the Act indicates the same purpose.

"The engineer's statement which was held inadmissible in this case falls into quite a different category. It is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act. If it did, then any law office in the land could follow the same course, since business as defined in the Act includes the professions. We would then have a real perversion of a rule designed to facilitate admission of records which experience has shown to be quite trustworthy. Any business by in-

stalling a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify those reports under the Act. The result would be that the Act would cover any system of recording events or occurrences provided it was 'regular' and though it had little or nothing to do with the management or operation of the business as such. Preparation of cases for trial by virtue of being a 'business' or incidental thereto would obtain the benefits of this liberalized version of the early shop book rule. The probability of trustworthiness of records because they were routine reflections of the day to day operations of a business would be forgotten as the basis of the rule. See Conner v. Seattle, R. & S. R. Co., 56 Wash. 310, 312, 313, 105 P. 634, 25 L.R.A.,N.S., 930, 134 Am.St.Rep. 1110. Regularity of preparation would become the test rather than the character of the records and their earmarks of reliability (Chesapeake & Delaware Canal Co. v. United States, 250 U.S. 123, 128, 129, 39 S.Ct. 407, 408, 409, 63 L. Ed. 889) acquired from their source and origin and the nature of their compilation. We cannot so completely empty the words of the Act of their historic meaning. If the Act is to be extended to apply not only to a 'regular course' of a business but also to any 'regular course' of conduct which may have some relationship to business, Congress not this Court must extend it. Such a major change which opens wide the door to avoidance of cross-examination should not be left to implication. Nor is it any answer to say that Congress has provided in the Act that the various circumstances of the making of the record should affect its weight not its admissibility. That provision comes into play only in case the other requirements of the Act are met.

"In short, it is manifest that in this case those reports are not for the systematic conduct of the enterprise as a railroad business. Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading.

\*     \*     \*     \*     \*     \*

"The several hundred years of history behind the Act (Wigmore, supra, §§ 1517–1520) indicate the nature of the reforms which it was designed to effect. It should of course be liberally interpreted so as to do away with the anachronistic rules which gave rise to its need and at which it was aimed. But 'regular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business." 63 S.Ct. at page 479-481.

Defendant says that the plaintiff first went into the question as to testimony given by the defendant before the coroner and insists, therefore, that he (defendant) was entitled to have the entire statement admitted in evidence. But plaintiff did not introduce any portion of the testimony so recorded or make any inquiry as to the character thereof. True, counsel for plaintiff had the coroner identify the file containing the defendant's written statement, but such action did not entitle the defendant to introduce his said statement as original or primary evidence. We find nothing in the remarks of counsel for plaintiff which properly can be construed as amounting to a waiver of objections to the introduction of said statement. The trial court did not so consider the remarks made by counsel for plaintiff. He overruled the objections interposed to the introduction of the statement on the ground that in his opinion it was admissible in evidence under the provisions of § 415, Title 7, Code 1940.

Certainly we cannot say in this case that the error committed in admitting the said statement in evidence was harmless. Although the testimony of Mr. Bales, the driver of the car, was in many respects in accord with the statement made by defendant before the coroner, that fact does not render harmless the error committed in permitting the defendant to get before the jury his story of how the accident occurred without subjecting himself to cross-examination.

We hold that the trial court erred to a reversal in overruling plaintiff's objections to the introduction of the said statement of defendant and permitting it to be received in evidence.

In making out her case the plaintiff called three witnesses who testified as to statements which the defendant is alleged to have made shortly after the accident occurred. The first witness was a newspaper reporter who testified as to a story which he wrote for one of the Birmingham papers based on a conversation which he had with defendant. He testified that the following appeared in the story:

"Lee told Coroner Gyp Evans he was getting out of the front seat of the automobile, and Charles Bales was driving the car, and when he, Lee, reached for the gun it went off while he was backing out of the car. Nelson was in the rear seat by himself. The muzzle was resting against the back of the front seat, and the bullet went through the upholstery. Lee said 'We didn't know Nelson had been shot until I saw the blood.' Lee told the coroner he reached for the rifle but did not remember even touching it."

The plaintiff, the wife of deceased, and Mr. C. B. Nelson, the deceased's father, both testified that shortly after the accident the defendant told them in effect that the shooting of Nelson was a careless act.

Bales, the driver of the automobile, testified in behalf of the defendant. From his version of the events which transpired on the hunting trip, we think the jury could have found that at a point sixteen or seventeen miles south of Birmingham, the defendant passed his rifle from the front seat to the rear seat at the request of the deceased; that when such was done the rifle was not loaded and the bolt was open; that the deceased had the defendant's cartridges, which he had previously borrowed; that after shooting the rifle once and making preparations to shoot again, the deceased returned the rifle to defendant on the front seat, and the defendant placed it in the same position as it had been all during the trip except when it was actually in use, that is, with its stock on the floorboard and the muzzle pressed into the upholstery of the back part of the front seat, pointing toward the rear seat where the deceased was sitting. Since the deceased had the cartridges

which fitted the defendant's rifle and was the last to use it, the jury could have reasonably found that when the deceased returned the rifle to defendant it was loaded and that the deceased failed to inform the defendant or Bales of that fact. From Bales's evidence the jury could have found that the deceased knew how the rifle had been placed by the defendant after it was returned to him and continued to remain in the back seat with the rifle pointed in that direction.

Under the pleadings and evidence in this case, the plaintiff was not entitled to the general affirmative charge nor was she entitled to have the court charge that if the jury believed the evidence the deceased was not guilty of contributory negligence. We think that the questions as to whether the defendant was guilty of negligence and the deceased guilty of contributory negligence were left properly for the jury's determination. The facts shown in this case certainly were not such as to preclude an inference that deceased had been guilty of negligence which proximately contributed to his injury. We hold, therefore, that the plaintiff's requested Charges 1 and 2 were correctly refused.

Charge No. 3 requested by plaintiff was properly refused. It appears to have been requested on the theory that the doctrine of res ipsa loquitur has application in this case. But if such doctrine did have application, which question we do not decide, plaintiff's requested Charge No. 3 was properly refused in that it was susceptible of the construction that under such doctrine the burden of proof shifts to the defendant in this type of case. Such is not the rule in this jurisdiction. Except in certain specified types of cases (see Southeastern Greyhound Line v. Callahan, 244 Ala. 449, 13 So.2d 660), the rule in this jurisdiction is that as a result of prima facie proof or legal presumption the duty of going forward with the evidence shifts to the defendant but not the burden of proof. Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257; Cox v. Roberts, 248 Ala. 372, 27 So.2d 617.

Plaintiff's requested Charge No. 4 was correctly refused on the ground that it gives undue prominence to certain phases of the evidence, ignoring other aspects thereof.

The trial court erred in giving Charge No. 6 requested by defendant. Under the decisions of this court this charge placed too high a degree of proof upon plaintiff. Monte v. Narramore, 201 Ala. 200, 77 So. 726; Allen v. Birmingham Southern Ry., 210 Ala. 41, 97 So. 93; Bice v. Steverson, 211 Ala. 103, 99 So. 639; Culverhouse v. Gammill, 217 Ala. 137, 115 So. 105.

It was not error to give defendant's requested Charge No. 9. Louisville & N. R. Co. v. Steverson, 220 Ala. 158, 124 So. 205, and cases there cited. The criticism that the charge does not hypothesize a fair and full consideration of the evidence by the jury is hypercritical. This charge is wholly different in import from Charges 17 and 18, held bad in Coleman v. Adkins, 232 Ala. 351, 168 So. 184, and Charges 11 and 13, held bad in Asbury v. Mountz, 234 Ala. 553, 176 So. 282.

Nor did the trial court err in giving defendant's requested Charge No. 7. Bankers' Mortg. Bond Co. v. Rosenthal, 226 Ala. 135, 145 So. 456. The fact that Count 5 was the only count submitted to the jury does not make the giving of this charge reversible error. If plaintiff thought that the jury would confuse "One Count" with "Count One" of the complaint, an explanatory charge should have been requested.

There was no error in giving defendant's requested Charge S. This charge was not bad because it contains the words "slightest degree." In Smith v. Crenshaw, 220 Ala. 510, 126 So. 127, in dealing with a charge similar in that respect, it was said: "We are now declaring the proper rule to be, on appeal in cases of this sort, that error will not be imputed to the trial court for either giving or refusing charges of this particular character and that the Bynum and other like cases are to this extent modified." Nor was the giving of this charge reversible error because of the fact that it requires a reference to the pleadings in the cause. It is true that charges should hypothesize the

facts relied upon as a defense, and not require the jury to examine and consider the plea in order to determine what is meant by such charges. Birmingham Railway, Light & Power Co. v. Fox, 174 Ala. 657, 56 So. 1013. However, the giving of such a charge does not constitute reversible error.

Likewise, error did not intervene in the giving of Charge T requested by the defendant because it required a reference to the pleading.

Charge U also requires a reference to the plea of contributory negligence but, as above indicated, this fact does not make the giving of this charge reversible error. The other parts of Charge U correctly stated the law as to damages which are awarded in a case of this kind.

What is said above as to Charge U applies to Charge X requested by the defendant.

The giving of written Charges A, B, and C at the request of the defendant did not constitute reversible error. These charges were "unavoidable accident" charges and although the better practice is to refuse charges of that type because of their tendency to confuse and mislead, it is not reversible error for such charges to be given. Conner v. Foregger, 242 Ala. 275, 7 So.2d 856; Smith v. Baggett, 218 Ala. 227, 118 So. 283.

For the errors above indicated, this cause must be reversed and remanded.

Reversed and remanded.

GARDNER, C. J., and FOSTER and STAKELY, JJ., concur.